## 27126. GEORGIA POWER COMPANY *v.* SHEATS.

DECIDED OCTOBER 31, 1938. REHEARING DENIED NOVEMBER 16, 1938.

*MacDougald, Troutman & Arkwright, Dudley Cook, Harllee Branch Jr.,* for plaintiff in error.

*Augustine Sams, C. Holland Feagan,* contra.

Judge GUERRY was designated for this case instead of Presiding Judge STEPHENS, disqualified.

SUTTON, J. Mrs. W. E. Sheats brought suit against Georgia Power Company, for damages on account of injuries sustained, as an invitee, by reason of having fallen on steps located immediately outside of swinging doors in the defendant's building. The de-

fendant was alleged to have been negligent (a) in constructing and maintaining the swinging doors over a sudden drop-off or step-down in a marble floor as described in the petition; (b) in failing to use ordinary care to repair or correct the building, at the point where the plaintiff was injured, by eliminating or moving the doors so that they would not swing over a sudden or concealed drop-down or step-down; (c) in failing to place around the defect a guard-rail to protect the plaintiff and others therefrom, or to warn her by sign, red light, or otherwise protect her therefrom; (d) in constructing the swinging doors approximately four and a half inches from a drop-down, thus obstructing the view there-of six or eight inches deep to a new floor level; (e) in knowingly allowing the plaintiff to enter upon the hidden peril of said unexpected drop-off or step-down; (f) in not keeping the premises, walkways, and hallway safe for ordinary use by plaintiff and others. The jury returned a verdict in favor of the plaintiff. The defendant filed a motion for new trial on the general grounds, and by amendment added several special grounds, and the exception here is to the judgment overruling the motion.

The evidence showed substantially the following facts: The defendant maintains two buildings wherein are housed its general offices and in which it conducts business with the public. One of these buildings faces Marietta Street in the City of Atlanta. The ground floor is used for a salesroom, and also as a place where the public may contract for and pay for electric service. Overhead are offices of the company. Immediately behind this building and facing Walton Street is another building occupied by the defendant. The ground floor contains certain appliances which the company offers for sale, and above are several floors which the company uses as offices. Situated on the third floor of this building, which we shall refer to as the Walton Street building, is the claim office of the company. In charge of that department is Mr. L. F. Wynne. The two buildings are connected by an overhead passageway. Fairlie Street runs along the eastern side of the two buildings from Marietta Street to Walton Street. From Fairlie Street one enters into a small hallway on the ground floor of the Walton Street building, the entrance being about halfway between Marietta and Walton Streets, and the hallway being in that part of the building which is nearest the Marietta Street building. Another en-

trance leads from Walton Street into the Walton Street building. In the hallway which one enters from Fairlie Street three elevators are maintained for the purpose of transporting persons to the upper floors of the two buildings. On the right as one enters the hallway, and just about in front of the first elevator, is a set of stairs which leads to the floors above. At the end of the hallway, and facing a person entering the hallway, is a short flight of steps which lead to the ground floor of the Walton Street building where electric appliances are displayed. From this display room another set of stairs leads to a mezzanine floor. "On that mezzanine floor was a washing-machine department." Here also is the private office of the manager of that department. These steps are described by the custodian of the building as follows: "The flight of stairs going up to the mezzanine floor are approximately four or five feet in width. And those stairs going up there have a brass railing on them. The stairs that go up there have a brass railing on them, and that railing makes a curve, and that makes a sort of cap to it. Those stairs are just as wide as other stairs that reach upstairs. They are not wider. They are approximately the same." It was further testified by the witness that to go upstairs from the ground floor, the display room, of the Walton Street building to the upper floors, the route by these stairs would be shorter than to return to the hallway at the Fairlie Street entrance and take the elevator. These particular stairs are not, however, intended for use by the general public, but are for the convenience of employees in passing from the display room of the Walton Street building to a hallway, where an elevator might be entered on the second floor and the employee be conveyed to other floors. No sign or other warning notifies the public that such steps are for the exclusive use of the company's employees. To reach the elevator in the hallway one turns to the left on arriving at the top of the stairs just mentioned, and there he encounters a pair of swinging doors through which he passes eastwardly into the hallway. In doing so he faces the eastern side of the building or hallway, at which end there is a window with frosted glass. The mezzanine floor in the Walton Street building, from which one emerges, is covered with brown linoleum, and the hallway outside is paved with light gray marble. The doors, at the time of the injury, were constructed with screen, fine-mesh wire, protected by a grill, each door having

a heavy eight- or ten-inch baseboard. No handle or knob is upon either door. The level of the mezzanine floor and threshold of the doors end about four and one half inches beyond the position of the doors when closed, and there is a perpendicular drop of about seven inches to the level of the hallway where the elevators may be reached.

The undisputed evidence shows that the visit of the plaintiff, at the time of the injury, was in connection with a claim for damages to her automobile. She first went to the ground floor of the Marietta Street building, that being the only part of the premises she had theretofore been in, and there inquired as to where she might file a claim with the company. She was directed to Mr. L. F. Wynne, the claim manager, who occupied an office on the third floor of the Walton Street building. Her testimony as to her movements and the manner of her injury thereafter is substantially as follows: "I went up a set of stairs to the mezzanine floor. So far as I know I had never been in the building before. They were near the entrance, the Fairlie entrance to the annex [the Walton Street building], and I followed the stairs. When I went up those stairs I came to two doors on the mezzanine floor. I was walking along ordinarily. When I came to those doors I made a left turn and pushed the door open, the left door of the double door with my right hand, . . and when I pushed the left door open I stepped out with my right foot into space and was thrown forward the full length of my body against the white tile floor cement. It was a nice hard floor. I never knew there was any drop-off or step-down. . . After I fell into this step-down, yes, at the time, I realized that the door was very close to the edge of the step. In fact, it seemed to me it was flush with the step. . . When I went through the door there was not anything there to indicate the floor was not level with the floor which I was standing on. . . The sun was shining brightly. There was a window there. The sun was shining through on the floor." The plaintiff then testified that in the hallway on the ground floor which she entered from Fairlie Street there was a directory which had on it the names of employees and their office numbers, and it is shown by other evidence that this directory showed that Mr. Wynne's office was on the third floor of the Walton Street building. She further testified: "I don't know how many steps I went up. . .

As to whether I don't know those steps go to the mezzanine floor in front of the elevators where I say I went—I didn't know it at the time. I don't know it now, but I came to the double doors that opened there into the space where I fell, and I didn't know anything further. . . As to what sort of room I was in, I didn't pay it any attention. . . I walked through the space and turned around. I don't know why I didn't take the elevator. . . As to exactly which steps I did go up when I went in this building, I could show you. As to whether I can look at that picture and show you which one it was—explain that to me. What is that? In the Fairlie Street annex? . . I recollect nothing about it except I didn't ride the elevator. I did go up the steps, and there were electrical appliances there when I went and along the route. I went to the mezzanine floor is all I know. . . As to whether, as matter of fact, I walked straight by the elevators and up those little steps there, looking at the picture I can not say, I walked upstairs. As to whether I didn't walk up those steps facing the Fairlie Street entrance like that, I went around and faced due east. I don't remember it like that picture. I have a little hazy recollection of it. I know I went up the steps. I know I thrust the door open and fell and I can recollect very little about it. . . Whatever steps I walked up, I got up to the top of those steps, and the only thing I saw there were some steps which nobody was using that I recollect. . . Before I opened the door I was looking straight in front of me. . . I opened the door before I stepped down that step. I didn't look. I fell. The window I was facing didn't have clear glass in it, it had frosted glass. It was white, something light. There was plenty of light out in that space where I was going. It was not dark. . . That frosted glass made a shadow. The shadow was on the side where I stood. I stepped onto a white floor from a dark floor. I didn't notice the difference in color before I stepped down and fell. It is a light floor, I don't know whether marble block or tile or something else. It was a light floor. If it was in blocks I can't recollect. . . I saw a floor in front of me as I was stepping through, and I don't know what it was. I didn't look to see whether wood or what. . . The doors are set in the middle of a marble sill. . . There is a step showing in the picture, but I didn't see it at the time. . . As to whether I could not walk

through the doors if they were shut—it was not the door, it was the step that made me fall. The doors were not open. I pushed them open, and the sun shone on this side and made a shadow. When the door is open you can see the difference. A party standing there looking at it can. You can see if you look. That is true, but I was not standing. I was walking through, and in walking through you wouldn't see the difference. With the doors shut it looked like it was level. You must remember these doors obscured that step. As to whether they didn't when I opened them—I don't look at my feet as I walk along the time. I didn't look at my feet. I don't look down at my feet. When I am walking I look out in front of me a few steps. . . As to what I did that day—I just didn't take the time to watch. There was no indication of a step, there was no sign there, and nobody instructed me. . . I have never seen doors open and go right down steps, no, sir. . . I opened the left-hand door with my right hand . . and I stepped through with my right foot. . . I had my pocketbook in my left hand. . . When I went from there [the main office] I did not see several people there. I saw one, two, or three. As to whether it was after or before I went upstairs that I saw those two or three people—I saw two people before I went upstairs, and just after I fell I saw another. I saw two, and went upstairs and saw the third. As I got to the mezzanine floor it was there I saw the man, at the place where he came through the double doors. I saw the people and I went up the steps, and then I turned to the east. When I turned east I came to the two doors." The plaintiff also testified that she received certain described injuries, including a broken leg and dislocated hip; and there was other evidence as to her injuries.

Lilburn Sheats, minor son of the plaintiff, testified, that he accompanied his mother on the occasion of her injury; that when they got to the Walton Street Building they first went to the ground floor where there were some appliances; that no one except a woman said anything to them, and they wanted to know where to go, and after something was said to them they went upstairs to the mezzanine floor; that his mother was in front, and pushed the doors open and stepped out and fell; that the doors were swinging doors, screen, mesh-screen doors, with a grill at the bottom and a kind of baseboard at the bottom; that he did not know that the doors swung

over a different elevation in the floor, did not know there was a drop-off; and that after she fell he found that there was one. W. E. Sheats, husband of the plaintiff, testified as to the location of the ground ·floor of the Walton Street building, the mezzanine floor, stairs leading thereto, and that the main steps to the building go right up opposite the elevators in the hallway near the Fairlie Street entrance. W. L. Quinlen, the building manager, testified: "When you go into the entrance you come to a stairway and to the elevators. The stairs are on the right side just before you get to the elevators, starting just about even with the first elevator. . . The way provided in that building for people who wish to go to the claim department on the third floor is by elevators. The elevators are right there. If for some peculiar reason to themselves a person desires to walk up three flights of stairs rather than go in the elevator, the stairway they would use is right here [indicating]. The stairs provided for the use of the public are right here. That is a continuation of these steps. If you had gone up these steps into the Walton Street salesroom and taken the set of steps from there, as to what were those steps from the salesroom to the mezzanine floor put there for—they were put there to go to the mezzanine floor from the salesroom floor. . . That walkway was for the convenience of employees going from one building to another. That is not for the use of the public. There was a stairway from the salesroom up to Mr. Lewis's office [on the mezzanine]. That is for the salesmen, for the use of salesmen and employees of the company. If a person came into the building and wished to go to the third floor, for instance, the most direct route and the way provided for the public is just to go in the Fairlie Street entrance to the building, and on the right just as you go in are the stairs, and right in front of you are the elevators. There is a public stairway by the elevators. . . The door was not put there [on the mezzanine floor] for the use of any member of the public. It was put there for the use of the employees of the company. If you wished to go to the claim department in the way provided for the public, you would not use that door."

■ It is the contention of the plaintiff in error that the evidence shows that at the time of her injury the plaintiff was not an invitee, but only a licensee, to whom the defendant owed no duty to exercise ordinary care in keeping safe the portion of the

premises where she was injured; that the evidence shows that she did not use the usual and customary means of ingress and egress in seeking the claim department; and that even if she could be said to have been an invitee, the evidence shows that the defendant was not negligent in the construction and maintenance of the doors and step-off, and that her own negligence was the cause of the injury and damage which she sustained. "'Where the owner or occupier of land, by express or implied invitation, induces or leads others to come upon his premises for any lawful purpose, he is liable in damages to such persons for injuries occasioned by his failure to exercise ordinary care in keeping the premises and approaches safe.' Civil Code (1910), § 4420 [Code of 1933, § 105-401]. But 'there is a clear distinction between a "license" and an "invitation" to enter premises, and an equally clear distinction as to the duty of the owner in the two cases. An owner owes to a licensee no duty as to the condition of the premises, unless imposed by statute, save that he should not knowingly let him run upon a hidden peril, or wilfully cause him harm; while to one invited he is under obligation for reasonable security for the purposes of the invitation.'" *Smith* v. *Jewell Cotton Mill Co.*, 29 *Ga. App.* 461 (116 S. E. 17). Construing this section, it was held in *Fulton Ice & Coal Co.* v. *Pece*, 29 *Ga. App.* 507 (116 S. E. 57): "This section places upon such owner or occupier of land the duty to exercise ordinary care, for the safety of his invitees, in discovering defects or dangers in the premises or instrumentalities thereon, and imposes a liability for injuries resulting from such defects as a reasonable inspection would disclose. Such owner or occupier of land is liable for a failure to warn his invitees of dangers or defects in such premises or instrumentalities, of which he knew or of which it was his duty to know in the exercise of ordinary care." See also *Coffee* v. *Bradshaw*, 46 *Ga. App.* 143 (167 S. E. 119); *Tybee Amusement Co.* v. *Odum*, 51 *Ga. App.* 1 (179 S. E. 415). In the *Coffee* case it was said: "An implied invitation is one which is held to be extended by reason of the owner doing something or permitting something to be done which fairly indicates to the person entering that his entry and use of the property is consistent with the intents and purposes of the owner. . . The duty to keep premises safe for invitees extends to all portions of the premises which are included within the invitation and which it is necessary

or convenient for the invitee to visit or use in the course of the business for which the invitation was extended, and at which his presence should therefore reasonably be anticipated, or to which he is allowed to go. . . If the invitee does not go beyond that part of the premises to which, *as the situation reasonably appears to him, the invitation extends, he can not be held to have become a mere licensee because, as a matter of fact, the purposes of the invitation could have been fulfilled without going on such part of the premises.*" (Italics ours.) In *Jones* v. *Asa G. Candler Inc.*, 22 *Ga. App.* 717, 719 (97 S. E. 112), quoting from a leading foreign case, Plummer *v.* Dill, 156 Mass. 426 (31 N. E. 128, 32 Am. St. R. 463), it was said: "It is well settled that to come under an implied invitation, as distinguished from a mere license, the visitor must come for a purpose connected with the business in which the occupant is engaged, or which he permits to be carried on there. There must be at least some mutuality of interest in the subject to which the visitor's business relates, although the particular thing which is the object of the visit may not be for the benefit of the occupant." In *Mandeville Mills* v. *Dale,* 2 *Ga. App.* 607, 610 (58 S. E. 1060), quoting from another Massachusetts case, it was said: "The gist of the liability consists in the fact that the person injured did not act merely for his own convenience and pleasure, and from motives to which no act or sign of the owner or occupant contributed, but that he entered the premises because he was led to believe that they were intended to be used by visitors or passengers, and that such use was not only acquiesced in by the owner or person in possession and control of the premises, but that it was in accordance with the intention and design with which the way or place was adapted and prepared or allowed to be used." In *Smith* v. *Jewell Colton Mills Co.,* supra, it was held: "Such an invitation may cover the right as an invitee to be protected by the ordinary care of the owner not only upon such portions of the premises as may be necessary for mere ingress and egress, but upon those parts which are necessary or incidental to the mutual business or purposes of the invitation."

The undisputed evidence shows that the defendant maintained its claim office on the third floor of the Walton Street building, and that the purpose of the plaintiff's visit on the occasion of her injury was in connection with a claim against the company for dam-

age to her automobile. Clearly the evidence authorized, if it did not demand, a finding that when the plaintiff entered the hallway near the Fairlie Street entrance she was an invitee. But, while this is apparently not denied in the brief of counsel for the plaintiff in error, it is contended that she lost her status as an invitee by reason of what counsel conceives to be aimless wandering on her part on a portion of the premises not intended by the defendant to be used in connection with filing or adjusting a claim. Applying to the facts of this case the legal principles laid down in the cases from which we have quoted, it could not be said as a matter of law that the jury would not be authorized to find that at all times, after the plaintiff entered the hallway at the Fairlie Street entrance up to and including the moment of her injury, she was an invitee, seeking, on portions of the premises which reasonably appeared to her to be incidental approaches, the claim office which was maintained on the third floor of the building. Notwithstanding elevators were at hand for the accommodation of those who might wish to visit the upper floors of the building, an invitee is not precluded from choosing a stairway which might reasonably appear as being a usuable approach to the claim office. This truth is recognized in the act of the defendant in introducing testimony that a stairway, almost immediately in front of the first elevator encountered from Fairlie Street, was maintained for the use of the public in going to the upper floors, including that on which its claim office was located. But it must be remembered that the claim office was on the third floor *of the Walton Street building,* as indicated by the hallway directory and other evidence; and nothing in the hallway suggested that the steps at the end of the hallway, which were apparently taken by the plaintiff, were not incidental to one's progress to the claim office. After reaching the display room in the Walton Street building, by means of such short stairs, a substantial stairway, not elevators, was therein observed by the plaintiff. There is no evidence of any aimless wandering or delay in and about that display room. It indefinitely appears that some conversation took place with an employee in that department, and that after a brief interval the plaintiff ascended those stairs. On reaching the mezzanine she proceeded toward and through swinging doors which opened into another hallway. There elevators or stairs were available for reaching the third floor. In proceeding from the display

room, into which she had never been before, she used the only stairway which she saw, or which appears to have existed therein; and, as testified by the manager of the building, that stairway was the nearest route from the display room to the third floor. It is shown, it is true, that such stairway was not intended by the defendant for use by the public, and it is urged that the plaintiff should have retraced her steps from the display room to the hallway in which she first appeared; but the evidence shows that nowhere was there any sign or warning that these stairs were for the exclusive use of the company's employees. In that situation we do not think that it could be said as a matter of law that the jury was not authorized to find that in the route she took in quest of the claim department she was not at all times an invitee. Consequently it follows that to her, as an invitee, the defendant owed the duty of using ordinary care in discovering defects or dangers in the premises or instrumentalities thereon, and that the law imposed on the defendant liability for a failure to warn the plaintiff of dangers or defects in the premises or instrumentalities thereon, of which it knew or of which it was its duty to know in the exercise of ordinary care.

Having established that the jury was authorized to find from the evidence that the plaintiff was an invitee in the present instance, it is now necessary to decide whether or not they were authorized to find that the defendant was negligent in one or more of the particulars alleged in the petition. It is undisputed that the defendant was aware of the condition of the premises where the plaintiff was injured. It affirmatively appears from testimony and a photograph introduced in evidence that the swinging doors through which she passed were attached to devices at the end of a gray or white marble threshold, a part of which marble extended into the mezzanine and a part of which protruded beyond the closed position of the doors about four and one-half inches in the direction of an outer hallway. The slab or threshold appears to be about on a level with the floor of the mezzanine. The doors with wooden framework about four inches in width were constructed of mesh screen, reinforced or protected by an iron grill, but at the bottom of the doors there was an eight- or ten-inch baseboard, concealing the fact that the level of the outer hallway was about seven inches lower than that of the mezzanine, the drop or step-down occurring

about four and one-half inches beyond the doors when closed. The plaintiff testified, that on approaching or before she stepped through the doors she looked through the doors; that she did not look at the base of the door, but put her right hand on the left door, opened it, and stepped through as she did; that on going through she faced a window of frosted glass at the end of the hallway; that the sun was shining through the glass upon the hallway, constructed of small gray or white blocks of marble; that she did not know that there was a difference in the floor levels before she stepped through the doors; that the doors obscured the step-down; that she did not look after she opened the door, just stepped and fell, did not take the time to watch as there was no indication of a step; there was no sign there, and nobody instructed her. As a result of stepping through the doors she was thrown to the floor and sustained serious injuries. As was said in *Rothschild* v. *First National Bank*, 54 *Ga. App.* 486, 488 (188 S. E. 301), "In deciding a question of this character, the fact is forced upon us, from the many cases we have examined, and the variety of judicial conclusions reached upon similar states of facts, that precedents are of little value, but each case must stand on its own facts. There can be no doubt that it is a difficult problem for a court to declare as a matter of law that one is negligent or lacking in ordinary care for his safety." We can not say as a matter of law in the present case that, as plaintiff in error contends, the plaintiff was negligent, and that her negligence was the proximate cause of her injuries. Nor can we say as a matter of law that the evidence did not show that the defendant was negligent in maintaining the combination of doors and adjacent step-down as described, or that the plaintiff by the exercise of ordinary care could have avoided the consequences of the defendant's negligence. All of these questions were for the determination of the jury, and we think that the verdict in favor of the plaintiff was authorized under the law and the evidence. This is not merely a case of different floor levels. It is not a case of swinging doors opening upon a lower level with which the plaintiff was familiar before passing through the doors. Such is the nature of some of the cases cited by the plaintiff in error. They, like the others cited by the plaintiff in error, are distinguishable on their facts, and do not require a ruling different from that we have made. While we find no exact precedent, we think that the present

742

case is governed in principle by *Rogers* v. *Sears*, 45 *Ga. App.* 772 (166 S. E. 64); *Fuller* v. *Louis Steyerman & Sons Inc.*, 46 *Ga. App.* 830 (169 S. E. 508); *Tybee Amusement Co.* v. *Odum*, supra; *Wynne* v. *Southern Bell Tel. Co.*, 159 *Ga.* 623 (126 S. E. 388).

■ Grounds 1 to 6, inclusive, and ground 8 of the amendment to the motion for new trial, complain that the court erred in stating to the jury contentions of the plaintiff which, it is urged, were not supported by any evidence. It is not reversible error to state the contentions of parties as made by the pleadings. *Matthews* v. *Seaboard Air-Line Railway*, 17 *Ga. App.* 664 (87 S. E. 1097); *Georgia Railway &c. Co.* v. *Simms*, 33 *Ga. App.* 535 (5) (126 S. E. 850); *Western & Atlantic R.* v. *Lochridge*, 39 *Ga. App.* 246 (4) (146 S. E. 776); *Hunt* v. *Pollard*, 55 *Ga. App.* 423 (5) (190 S. E. 71). Moreover, the court explained to the jury that the pleadings were not evidence and were not to be considered as such. Ground 7 complains that the court erred in failing to charge the jury as to reconciling any conflict in the testimony of witnesses and as to their credibility. In the absence of a proper written request it is not error for the court to fail to charge in those particulars. *White* v. *State*, 141 *Ga.* 526 (3) (81 S. E. 440); *Darden* v. *State*, 171 *Ga.* 160 (6) (155 S. E. 38); *Kelley* v. *Smith*, 175 *Ga.* 277 (2) (165 S. E. 87); *Quarles* v. *State*, 37 *Ga. App.* 520 (8) (140 S. E. 788). Ground 9 complains that the court erred in charging the jury, "If she shows by the evidence that some one or more of the said acts was the proximate cause of the injury complained of, and the defendant was negligent, the plaintiff would be entitled to recover so far as that phase of the case is concerned," it being contended that the charge instructed the jury that if the defendant failed to exercise ordinary care toward the plaintiff, as a result whereof the plaintiff was injured, she could recover; and that such rule of law was not applicable to the evidence in the case, inasmuch as the uncontradicted evidence showed, as plaintiff in error contends, that the plaintiff was a licensee, and to her the defendant did not owe the duty of exercising ordinary care for her safety; and thereby an unauthorized greater burden was placed upon the defendant. This excerpt immediately followed a general statement that the plaintiff, in order to recover, was not required to prove every act of negligence set forth in the petition, and, properly construed, was not equivalent to a charge that the plaintiff could recover in all events

by showing that one or more of the alleged acts of negligence was the proximate cause of her injury, but only that in the event of recovery, the full conditions and qualifications of which were elsewhere fully included in the charge, so far as the *phase of negligence* was concerned, if recovery was otherwise proper under the charge, only one or more acts of negligence need be proved as the proximate cause of her injury. Furthermore, under the contention that the charge was inapplicable because the evidence showed the plaintiff to be a licensee, in which case the defendant is not under the duty of exercising ordinary care, the ground is incomplete in itself, in that no evidence is set forth from which the status of a licensee could be ascertained, and no question is properly presented for consideration.

Ground 10 complains of a portion of the charge wherein the court instructed the jury that the law required the defendant to be in the exercise of ordinary care in respect to the acts alleged to be negligent, it being contended that it led the jury to believe that the plaintiff was not a licensee, and imposed upon defendant a greater burden than the law required. No evidence is included in the ground in support of the contention that the plaintiff was a licensee; and being incomplete in itself, the ground can not be considered.

The charge of the court that "if you find from the evidence, under the rules of law which I give you in charge, that the plaintiff at the time of the occurrence complained of was in the defendant's building upon a lawful mission, for the purpose of transacting business with the defendant, she was what is known in the law as an invitee, being there upon the implied invitation of the defendant, and as to her the defendant in such circumstances would be liable in damages, if you should find from the evidence, under the rules of law given you in charge, that the plaintiff was injured and that the injury was occasioned by reason of defendant's failure to exercise ordinary care in keeping the premises and approaches safe for such use; provided, of course, that you find the plaintiff is not otherwise precluded from recovering under the evidence and rules of law given you in charge," stated a correct principle of law as to the liability of an owner or occupant to one who is an invitee, and also qualified the right of the plaintiff to recover by stating "provided, of course, that you find the plaintiff is not otherwise precluded from recovering under the evidence and rules of law given you in

charge." If the defendant desired a specific charge as to the status of one aimlessly wandering on the premises, as movant's ground 11 charged the plaintiff to have been doing under the evidence, in which event, as a licensee, the defendant was under no duty to exercise ordinary care for her safety, a special request to charge should have been made. This ground is otherwise without merit, in that no evidence is incorporated which would support the contention that the plaintiff was only a licensee.

Grounds 12, 13 and 14, complaining of portions of the charge of the court, are similar in nature to ground 11, and are without merit for the reasons given above. The rest of the grounds assign error on the failure of the court to charge the definition of a licensee and the principles of law as to the liability of the defendant toward one occupying the status of a licensee. No special requests to charge were made, no evidence tending to show that the plaintiff was merely a licensee was incorporated or referred to in the grounds; and as the court in its complete charge fully covered the principles of law applicable to the facts of the present case, none of the grounds requires a reversal for any reason assigned.

*Judgment affirmed. Guerry and Felton, JJ., concur.*