The petition was not subject to the demurrers outlined in the opinion for the reasons therein stated. The verdict, while not demanded, was supported by the evidence; and the exceptions to the charge, as dealt with in the opinion, are without merit.
 No. 14772. MARCH 8, 1944.
Mrs. Effie Hogans sued Paul Allen Jones as guardian of Charles E. Thompson, who had been adjudged mentally incompetent. By amendment, Thompson himself was added as a party defendant, and Jones was appointed as the defendant's guardian ad litem. The petition prayed for the cancellation of two deeds: one to her home in Gibson, dated October 31, 1939; the other to 149 acres of land in Glascock County and her personal effects, dated December 20, 1940; which properties together constituted her entire estate, *Page 405 
conveyed to Thompson with a reservation of a life-estate. The petition as amended alleged in substance that Thompson was her nephew; that she had no husband or children and lived alone; that prior to a gunshot injury to him which resulted in his mental incapacity, he looked after all of the plaintiff's business affairs, and she relied exclusively upon him to guide her in all business transactions, reposing such confidence in him that she was entirely in his hands in such matters, and implicitly followed without question his advice and counsel in all matters; that at the time the deeds were signed she was aged and infirm and mentally unable to understand their contents, which was known to Thompson; that on October 31, 1939, Thompson took her to a hospital in Sandersville for an operation; that on the way he asked her to make a will leaving all of her property to him; that she agreed to this request on condition that he look after her, which he agreed to do; that while at the hospital under the influence of a drug to relieve her pain, and in a semiconscious condition, she signed a paper which she supposed was the will they had discussed, but which in fact was a deed to the house and lot in Gibson; reserving a life-estate; that she was unable to read or write and was wholly illiterate, but had learned to draw or write her name; that the deed expressed a consideration of $1.00 (which was not paid) and natural love and affection; that after the plaintiff had returned from the hospital and had recovered sufficiently to go to the business part of Gibson, and while she was passing the store of Thompson, she was called inside by him and asked to sign another paper, which she signed, remembering the conversation about the will, and being in a weak and enfeebled condition, incapable of understanding the nature of any transaction, and relying upon him in all things and upon his promise to look after her; that this proved to be a deed with a life-estate reserved to the 149 acres of land and her personal effects; that being mentally weak, infirm, and illiterate, and relying upon the advice of her nephew, she was unaware of having deeded away her property, until May, 1942, after the shooting of Thompson and his return from the hospital, by reason of which he had become mentally incompetent; that Thompson is unable to look after her, and for her support it is necessary to encroach upon the corpus of her estate; and that the cancellation of the fraudulently procured deeds is necessary to afford her the necessities of life. *Page 406 
Such demurrers to the petition as were not cured by amendment, and which were overruled by the court, are sufficiently set forth in the opinion.
The plaintiff sustained the allegations of the petition by her own testimony and by the testimony of other witnesses, except that she did not state the alleged conversation about the agreement to make the will or that she thought she was signing a will. She said that she did not know she had signed deeds until after Thompson came back from the hospital, apparently referring to his injury; and that after finding it out she immediately went to a lawyer. Mrs. Mattie Newsome testified: "Mrs. Hogans's physical condition was very bad, awful bad, before she went to the hospital. Her mental condition was just about like it is now, very weak. She knows how to go about the house and do what she has got to do, but so far as taking up any business or anything like that," she didn't think Mrs. Hogans could do that. "She doesn't know how to read and write, and when she was young girl she had congestion of the brain and it left her almost a perfect blank, and she had to be watched like a child for a long time. She has had a lot of trouble the last few years and has been in awful bad condition; there has been something awful the matter with her, and she has taken lots of shots, morphine or something of the sort, and when she takes one of them, she can't even walk by herself, she can't even stand up. and she doesn't know anything in the world. You can tell her anything and she doesn't remember it unless you tell her. For a while the doctor gave her one or two shots a week. The way she talks and acts makes me think her mind is in a weakened condition. She just doesn't talk like she knows what she is talking about, just like anybody else would that really didn't have the right mind if they were delirious. I don't think she has got her right mind none of the time, I really don't. She lived by herself in October, 1939, and in December, 1940. Charles E. Thompson was her nephew, her sister's son. When Mrs. Hogans came back from the hospital, she was very sick and couldn't sit up at all. Mrs. Hogans couldn't attend to any business at all. She is about sixty-four years old. During the two weeks after Mrs. Hogans came back from the hospital, [the witness] said something to Mrs. Hogans in Charlie Thompson's presence about making a will, stating that she ought to make a will, and Mr. Thompson was sitting *Page 407 
right there, but he didn't say anything at all; he didn't open his mouth. Mrs. Hogans replied that she wasn't going to give anybody anything she had as long as she lived and when she died they could do what they pleased with it. That was nearly two weeks after she came back from the hospital. Mr. Thompson was a very good business man. He was a merchant in his forties." There was evidence by Dr. Hinsley that, while he could not consider Mrs. Hogans crazy, and while he thought if the deed was read to her and she was not under the influence of a drug she would know what reserving a life-estate meant, he doubted if she would know the meaning of the clause reserving it as embodied in the deed. Mrs. Wilcher testified that she had known Mrs. Hogans as long as the witness could remember and had observed her conversation and acts; that her mind was weak and had been weak ever since she was a little girl; that except her sister she had no relative closer than a nephew; that she was constantly under the treatment of a doctor; that the doctor gives her morphine or something like that, and she is constantly under the influence of it; that she was with the plaintiff at the hospital and while the plaintiff was not "punctured" there, she was begging for it; that the witness lived next door and went to school with the plaintiff, who never learned to read and had to be taken out of school. Joe Wilcher testified that Mrs. Hogans always had a weak mind, could not read or write, and if anything was read to her, she couldn't tell it to save her life; that after her last boy was killed, or killed himself, Mrs. Hogans looked to Thompson as her sole adviser, and took his advice about everything without question.
There was evidence for the defendant by W. D. Allen, one of the witnesses to the deeds. He testified that the deed signed at the hospital was read to her "and she rose up in bed and said this is what I have been wanting to do for a long time;" that from hearing her talk and seeing her there listening to it, he thought she knew the nature and quality of her act. He didn't know whether the second deed was read to her, but as far as he could see she seemed normal and knew what she was doing. Vincent Williams gave similar testimony as to the latter deed. Casey Thigpen testified: "The first time I saw this deed, dated December 20, 1940, Mr. Thompson came to me and said that the clerk had refused to record it because none of the witnesses was a notary *Page 408 
public. He carried it to the clerk and the clerk would not record it because neither Mr. Allen nor Vincent Williams was a notary public, and I understood him to say that Mr. Walden said that Mr. Allen or Mr. Williams one would have to make an affidavit before a notary public that they witnessed it and he wanted me to fix it. I told him it would be easier to go by Mrs. Hogans's house and let her acknowledge her signature and let me witness it. He said that would suit him all right. So I carried it to Mrs. Hogans's house, showed it to her, and asked her if she signed it, and would it be all right for me to witness it as a notary public, and she said it would. She said that was her signature, and I asked her if it would be all right for me to witness it and she said yes. So I witnessed it in that way." On cross-examination he testified: "I carried this deed with me when I went to the home of Mrs. Effie Hogans on this occasion. I did not read it to her. I held it up like you have it now and showed it to her and told her Mr. Thompson wanted a notary to witness it, and I wanted to know if she signed it, and if I should witness it, and she said yes. At the present time I am counsel for Paul Allen Jones as guardian for Charles E. Thompson. I have known Mrs. Effie Hogans ten years. With reference to knowing the property she owns, I know the place in town, I don't know the farm. I don't know that she has been sick. I don't know anything about her being punctured. I am inclined to think I wrote both these deeds. It looks like my typewriter and my blanks. I think I prepared both of them. I did not know a thing about witnesses going to Sandersville on the evening of the 31st of October to get this signed up. I did not suggest to them that they needed three witnesses to a deed. I don't know a thing about how Roy F. Chalker got his name on there; I did not witness that deed. With reference to whether Charlie Thompson was in a hurry to get to Sandersville with this, I didn't know he was going to Sandersville. Charlie was a man that didn't talk much; he didn't tell me his business. As I recall, he came in and told me he wanted me to prepare a deed, and told me what he wanted in it and I prepared it. I didn't ask him any questions."
Paul A. Jones testified as to the inability of the defendant, Charles E. Thompson, to attend court and testify.
1. The petition set forth a cause of action. As amended it alleged with respect to the deed of October 31, 1939, that the defendant procured the plaintiff's signature thereto while she was in a hospital in a semi-conscious condition, with a weakened mind and under the influence of an anesthetic. With respect to the deed of December 20, 1940, it is alleged that the defendant told the plaintiff to sign the same at a time when her mind was still weak, which condition rendered her incapable of knowing the nature of any transaction; that at the time both were signed she was old, illiterate, and could neither read nor write, and she would not have known the effect had the paper been read to her, all of which was known to the defendant; that he took advantage of this condition and his confidential relationship to her, being her nephew upon whom she exclusively relied without question as her nearest male relative in all transactions and business matters; that she had no knowledge she had signed said deeds until May, 1942; that they were without any consideration; and that the mind of the defendant was at such times strong, active, alert, keen, and intellectual. See Burt
v. Burt, 145 Ga. 865 (90 S.E. 73); Dannelly v. CuthbertOil Co., 131 Ga. 694 (63 S.E. 257).
2. Grounds 2, 3, and 5 of the defendant's demurrer will be considered together. They assert that since the petition showed that the plaintiff had agreed to make a will giving her property to the defendant in consideration of his looking after her so long as she should live, and that she thought the instrument signed was a will and not a deed, her remedy was not to cancel the deed, which set forth a consideration of one dollar and natural love and affection, but to reform the instrument so as to make it conform to her admitted agreement to make a will, and that the plaintiff should not be permitted to cancel the deed without first offering to make a will in conformity with her agreement, and relieving the defendant of the obligation to pay the recited one-dollar monetary consideration. While it is true that the petition contained the allegations mentioned with respect to her agreement to make a will, and it was alleged that she thought it was such an instrument which the defendant induced her to sign, it was also alleged that at the time the deeds were signed, she was not only illiterate but incapable of understanding the nature of her act, and that she was *Page 410 
fraudulently induced to sign the deeds by the defendant, who at that time occupied a relationship of trust and confidence, he being her nearest male relative and the one to whom she looked with unquestioned confidence as to all her business affairs. This set out a good cause of action independently of any allegations with respect to a will; and if the deeds were thus fraudulently procured, the perpetrator of the fraud, in thus procuring a totally different character of instrument, can not avail himself of the fruits of his own fraud and deception by maintaining the validity of the instruments based upon a totally different consideration, unless and until the plaintiff shall offer to carry out the agreement actually arrived at. Especially would this be true since the demurrers in no way imply any indication in the petition that the plaintiff's failure to make a will constituted any part of the consideration of the deeds, nor that the defendant had complied, offered to comply, or even was in position to comply with the consideration of the proposed will.
3. The petition does not show that the plaintiff was guilty of such laches as would bar a recovery. It can not be said as a matter of law in a ruling on demurrer that because fraud was discovered in May, 1942, and no action was taken thereon until August, 1942, the petition failed to set out a cause of action. In Benson v. May, 149 Ga. 555 (2) (101 S.E. 177) a deed made on March 3, 1916, was sought to be set aside. The petition, filed some time subsequently to May 18, 1917 (which date was recited in the petition), was held to be sufficient against a demurrer complaining that it did not appear that the action was commenced promptly after discovery of the misrepresentation.
4. The evidence authorized the verdict. The question of mental capacity to make a deed is a question of fact to be determined by the jury. Hartley v. Marietta Nursery Co., 138 Ga. 736 (2) (76 S.E. 39); Lunday v. Foreman, 129 Ga. 595 (2), 598 (59 S.E. 276). While mere proof of weakness of mind not amounting to imbecility is not sufficient to warrant a jury in setting aside a contract, there being no proof of fraud or undue influence (Johnson v. Coleman, 134 Ga. 696, 68 S.E. 480; Richardson
v. Adams, 110 Ga. 425, 35 S.E. 648; Neel v. Powell,130 Ga. 756, 61 S.E. 729; Nance v. Stockburger, 111 Ga. 821,36 S.E. 100; Durrett v. McWhorter, 161 Ga. 179 (9), 186,129 S.E. 870), nevertheless, *Page 411 
it is true that where the mental weakness is pronounced, such as would prevent the grantor from understanding the nature of her act at the time the deed was executed, and especially where as alleged in this case, such mental impairment is united with alleged undue and controlling influence on the part of one occupying a confidential relationship with the illiterate grantor, it will authorize a cancellation on the ground of fraud.Maddox v. Simmons, 31 Ga. 512 (7), 530. "Any relations shall be deemed confidential, arising from nature or created by law, or resulting from contracts, where one party is so situated as to exercise a controlling influence over the will, conduct, and interest of another; or where, from similar relation of mutual confidence, the law requires the utmost good faith; such as partners, principal and agent, etc." Code, § 37-707. "Fraud may not be presumed, but being itself subtle, slight circumstances may be sufficient to carry conviction of its existence." Code, § 37-706. "Great inadequacy of consideration, joined with great disparity of mental ability in contracting a bargain, may justify equity in setting aside a sale or other contract." Code, § 37-710. There was evidence that the plaintiff's nephew, her nearest male relative, had complete and unquestioned control over the conduct of the plaintiff's affairs, and it was shown that at the time she signed the deeds to him she was mentally incapable of understanding the nature of her act and was not even aware that she had conveyed away all her property with a life-estate reserved, until long afterwards, and until two months before taking steps to cancel the deeds.
5. Grounds 1, 2, and 3 of the amended motion for new trial complain because the trial judge read to the jury in his charge allegations of the petition, which it is contended were not supported by evidence, or which were abandoned. These assignments of error, variously stated, relate to the same question. It is true that the witness was not interrogated about and did not testify concerning the allegations with respect to her promise to make a will, and that such an instrument was what she thought she was signing. Other allegations referred to in these assignments of error may have found support in the minds of the jury from the evidence.
Under our system of jurisprudence it is the right and duty of the presiding judge to state fairly and impartially to the jury the *Page 412 
contentions made between the parties litigant (City and SuburbanRy. v. Findley, 76 Ga. 311 (3)), and to instruct them upon the principles of law applicable thereto, the only restriction being that in so doing he shall make no intimation as to what has or has not been proved. Code, § 81-1104. The general rule is that a charge on legal principles must be adjusted to both the pleadings and the evidence. Southern Express Co. v. Newby,36 Ga. 635 (5) (91 Am. D. 783); McDonald v. DeLaperriere,178 Ga. 54 (4) (172 S.E. 1); Smoot v. Alexander, 188 Ga. 203
(4) (3 S.E.2d 593). This rule, however, is qualified when there has been evidence submitted without objection relating to the same cause of action, which could have been authorized by an amendment to the pleadings. Under such circumstances, in civil cases, the judge is authorized, but not required without request, to charge upon the issue thus made by the evidence. McLean v.Mann, 148 Ga. 114 (2) (95 S.E. 985); Keystone Pecan Co. v.Clark, 149 Ga. 836 (2) (102 S.E. 352); Cordele Sash, Door Lumber Co. v. Wilson Lumber Co., 129 Ga. 290 (2) (58 S.E. 860); Martin v. Nichols, 127 Ga. 705 (2) (56 S.E. 995);Tucker v. Central of Georgia Railway Co., 122 Ga. 387 (6) (50 S.E. 128); Powell v. Berry, 145 Ga. 696 (5) (89 S.E. 753, L.R.A. 1917A, 306); Doggett v. Simms, 79 Ga. 253 (3) (4 S.E. 909); Livsey v. Georgia Railway Electric Co.,19 Ga. App. 687, 689 (91 S.E. 1074).
Another general rule, the converse of the one just stated, is that an instruction as to law on a material issue, unauthorized by the evidence, is improper, and if it is not apparent that the jury could not have been misled thereby, is cause for a new trial. Citizens Southern National Bank v. Kontz, 185 Ga. 131
(6) (194 S.E. 536). However, as was stated by this court inAtlanta, Knoxville c. Ry. Co. v. Gardner, 122 Ga. 82 (8), 93 (49 S.E. 818): "It is one thing to state what a party contends, and another and a very different thing to state the law applicable to such contentions." Accordingly, it was held by this court in Robertson v. Abernathy, 192 Ga. 694 (4 a), 698 (16 S.E.2d 584), that in charging the jury it is not reversible error to merely state correctly the contentions made by the allegations of the pleadings, even though some of them might not have been supported by the evidence. See also AmericusGas Electric Co. v. Coleman, 16 Ga. App. 17 (2) (84 S.E. 493); Western Atlantic Railroad v. Lochridge, *Page 413 39 Ga. App. 246 (4) (146 S.E. 776); Gledhill v. Harvey, 55 Ga. App. 322
(4) (190 S.E. 61); Georgia Power Co. v. Sheats, 58 Ga. App. 730
(2), 742 (199 S.E. 582); Armour Co. v. Roberts,63 Ga. App. 846 (12 S.E.2d 376); Powell v. Crowell,63 Ga. App. 890 (3), 891 (11 S.E.2d 918).
6. The 4th ground of the amended motion for new trial complains that the court charged the Code, § 48-107, in the absence of evidence to authorize it. That section provides: "A gift by any person just arriving at majority, or otherwise peculiarly subject to be affected by such influences, to his parent, guardian, trustee, attorney, or other person standing in a similar relationship of confidence, shall be scrutinized with great jealousy, and upon the slightest evidence of persuasion or influence towards this object, shall be declared void at the instance of the donor or his legal representative, at any time within five years after the making of such gift." There being evidence that the defendant was the nephew of the plaintiff, who left her affairs to him without question, he being her sole adviser and "what he said was right," this contention is without merit. See Sims v. Ferrill, 45 Ga. 585, 596, in which there was an allegation that the brother-in-law of the plaintiff stood in a fiduciary relationship to her at the time, but he denied the allegation, she testifying that she reposed trust and confidence in him as her brother-in-law, and it was held that this was a conflict in the testimony for the jury to pass upon. See alsoGaskins v. Gaskins, 145 Ga. 806 (89 S.E. 1080), in which an illiterate person executed a deed reposing full confidence in his father-in-law.
7. For the reasons set forth in the 4th division of the opinion, there was no error in giving in charge the Code, § 37-707, defining confidential relationship, in view of the evidence there set forth that the defendant was the nephew and nearest male relative of the plaintiff, and that she relied implicitly upon him.
8. The 6th ground of the amended motion for new trial complains of the following charge: "Now there is another issue involved in this case and that is that she contends that Mr. Thompson was in a confidential relationship with her; that he was her nephew, and she contends that she imposed confidence in him and acted upon his advice. I charge you that a person standing in confidential relation to another is not prohibited from exercising *Page 414 
any influence whatever to obtain benefit to himself. The influence must be what the law regards as undue influence. Such influence that is obtained by flattery, importunity, superiority of will, mind or character, which would give dominion over the will to such an extent as to destroy free agency, or constrain one to do against his will what he is unable to refuse. Such is the kind of influence which the law condemns as undue. The undue influence which will annul a deed must be of that potency, which substitutes somebody else's will for that of the grantor." This charge was appropriate to the issues involved and was favorable to the defendant. The same statement is applicable to the 7th ground of the amended motion for new trial, which complains of another charge in almost the identical language.
Judgment affirmed. All the Justices concur.